

The following constitutes
the order of the court. Signed August 5, 2016

_____
Charles Novack
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br>ALAN ALBERT HENRY OW,<br>      Debtor. | Case No. 15-41959 CN<br>Chapter 13 |
| ALAN ALBERT HENRY OW,<br>      Plaintiff,<br>vs.<br>MARIO OROPEZA, KAREN PASENTINE, GEORGE ANTHONY FREEMAN *aka* ANTHONY FREEMAN,<br>      Defendants. | Adversary No. 15-4069<br><br>**MEMORANDUM AFTER TRIAL** |

On February 17 and June 15, 2016, this court conducted a trial in this adversary proceeding. All parties were represented by counsel. Plaintiff Alan Albert Henry Ow ("Ow") seeks declaratory relief to determine that the secured claim held by defendant George Freeman ("Freeman") is unconscionable and therefore void. Ow claims that he was compelled to transfer a significant interest in an El Cerrito, California home to Freeman for far less than adequate consideration under the pressure of a pending trustee's sale. Freeman denies Ow's allegations, and seeks, in turn, declaratory relief that his secured claim against the home is valid. The following constitutes this

court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052[1].

The court's findings of fact regarding the underlying transaction are driven primarily by the documents introduced into evidence and Freeman's testimony. While there is little question that the parties' business dealings were compressed by the time constraints of the pending trustee's sale and muddled by their relative inexperience with real estate financing, only Freeman's testimony provided some context to the parties' transaction. In contrast, Ow generally could not explain what documents he signed or why he signed them, other than to say he "trusted" Freeman. His testimony regarding the transaction terms left this court more confused than enlightened, and it was only Freeman's testimony that provided this court with some clarity. Ow's testimony was far firmer, however, regarding *how* the deal came to be.

Ow, in his individual capacity and as trustee of his mother's trust, owns a single family residence located at 5724 Alta Punta Avenue, El Cerrito, California (the "El Cerrito Property"). Ow had lived at the El Cerrito Property for most of his life. In July 2011, the El Cerrito Property sustained significant fire damage and was declared unhabitable by the City of El Cerrito. After the fire, Ow lived with friends or in local motels. In March 2013, Ow defaulted on the note and deed of trust against the El Cerrito Property held by Citimortgage, Inc., the balance of which was approximately $85,000. After an unsuccessful loan modification and a short-lived Chapter 13 bankruptcy, Citimortgage noticed a trustee's sale for June 6, 2014.

Ow lacked the funds to repair the fire damage or cure the approximately $24,000 in Citimortgage arrears. In May 2014, a friend introduced Ow to Freeman, who this court understands is a local insurance agent. Freeman had a modicum of experience in real estate investments and loans. Freeman and Ow met several times before Freeman developed a plan to save the El Cerrito Property. Freeman proposed that he would cure the Citimortgage arrears and keep the note current until Ow sold the El Cerrito Property.[2] Freeman also informed Ow that he knew of third parties who

---

[1] Ow's request for declaratory relief is a core matter under 28 U.S.C. § 157(b)(2)(K). Freeman asserts in his counterclaim that his claims, too, are core matters. Regardless of the merits of that assertion, Freeman has consented to the entry of a final judgment by this court.

[2] No one disputes that Ow intended to sell the El Cerrito Property.

were interested in purchasing the property "as is" for $300,000. The prospective purchasers - defendants Mario Oropeza and Karen Passentine (collectively, "Oropeza") - conditioned their offer on their ability to obtain financing (which, in turn, required that they present the lender with construction plans to repair the fire damage). In exchange, Freeman requested a 35% interest in the El Cerrito Property.

Ow accepted Freeman's proposal, and the parties signed a letter agreement on May 30, 2014 (the "May 30th contract"). The May 30th contract stated that in exchange for curing the $24,200.70 in loan defaults, "A. George A. Freeman shall gain 35% ownership of the location immediately. B. Mario Oropeza and Karen Passentine shall gain the right to purchase the property for a value of $300,000 after the initial fire damage in the kitchen is repaired. The final execution and acceptance of this agreement will be formal once the mortgage carrier agrees to accept the arrears payment." The May 30th contract also contained an "addendum," which states that "Alan Ow will receive a minimum of $120,000 from the proceeds of the home." Citimortgage accepted the cure proceeds and withdrew the trustee's sale.[3] Neither party obtained an appraisal of the El Cerrito Property. Freeman believed that the $120,000 minimum generally reflected the net value of Ow's 65% equity interest.[4]

On June 19, 2014, Ow signed a "Warranty Deed" clumsily prepared by Freeman which stated that Freeman would receive a 32.5% interest in the El Cerrito Property. The Warranty Deed did not contain a description of the El Cerrito Property and was not recorded. Instead, at the apparent behest of the title company (Chicago Title) responsible for the Oropeza sale escrow, the parties executed a note and deed of trust  The "Straight Note" is dated July 29, 2014, and states that Ow and his mother's living trust would pay Freeman $105,000 upon the close of escrow (the "Note"). The Note did not contain an interest rate. Ow signed the accompanying "Short Form Deed

---

[3] Freeman initially believed that he could cure the arrears from the proceeds of another real estate investment. These funds did not arrive in time, and Freeman testified that he borrowed the necessary funds from Oropeza.

[4] Freeman's rough calculation was ($300,000 x .65) - $85,000. While this equation results in $110,000, Freeman testified that he wanted to err on the side of fairness.

3

**Memorandum After Trial**

of Trust and Assignment of Rents" on August 5, 2014, and it was recorded by Chicago Title on August 13, 2014 (the "Deed of Trust").

Ow testified that he did not understand how Freeman arrived at the $105,000 Note amount. Freeman stated that he simply transferred his ownership interest in the El Cerrito Property into the Note and Deed of Trust to allow for a more efficient close of escrow. The Note amount equals a 35% interest in the El Cerrito Property's *gross* sales price of $300,000. If correct, Freeman believed that the May 30th contract entitled him to almost 50% of the net sales proceeds (not including, of course, the costs of sale).[5]

In the interim, the parties struggled to perform the remaining terms of the May 30th contract. While the bank's $24,200.70 in arrears were paid, Freeman was forced to borrow funds from Oropeza to satisfy this debt. Freeman did, however, make four or five subsequent monthly loan payments to Citimortgage to forestall any further foreclosure efforts, and advanced other funds towards cleaning the El Cerrito Property. Freeman asserted that he spent/borrowed $38,960.50 on the El Cerrito Property.[6] The court finds that to be a reasonable estimate of his out of pocket costs.

Freeman referred Ow and Oropeza to Jeremy Lebeau, a real estate agent, to prepare a sales contract. While the parties apparently signed a sales contract on or around July 8, 2014, they canceled the contract in late October 2014. Oropeza testified that while there was some delay in retaining a contractor (as required by his lender), he was ready to close. Oropeza stated that the sale did not close because Ow "stopped showing up." Freeman stopped making the monthly loan payments after the sale was canceled, and Citimortgage recorded a notice of default on January 27, 2015. Ow filed the underlying Chapter 13 case on June 18, 2015 to stay the foreclosure.

While Ow was uncertain regarding the details of his deal with Freeman or why he agreed to

---

[5] Freeman also stated that since he was paying off approximately 30% of the loan, he was entitled to approximately 30% of the sales proceeds. As the court noted, Freeman's testimony provided it with *some* clarity.

[6] He also testified, without contraction, that he spent several hours cleaning the El Cerrito Property. Freeman valued this time at $9,130.00. He did not explain, however, how he determined his $332 hourly rate.

4

**Memorandum After Trial**
Case: 15-04069   Doc# 40   Filed: 08/05/16   Entered: 08/05/16 13:24:17   Page 4 of 9

cancel the sale to Oropeza, he unhesitatingly testified that he had not choice but to sign the May 30th contract. Ow testified that he initially wanted to borrow money from Freeman to bring Citimortgage current, and to repay Freeman from the sales proceeds. Ow testified (along with his friend, Rosena Goldman), that Freeman a) constantly rushed him to sign the various documents, b) refused to give him complete copies of the documents that he signed, and 3) told him that he did not need an attorney to review the transaction. Goldman testified that she advised him to hire an attorney to examine the deal. Freeman denied these allegations. He stated that he and Ow met several times to discuss the terms of what ultimately became the May 30th contract, that he provided copies to Ow, and never told him that he did not need an attorney.

Ow's complaint asserts several claims for relief, including a) rescission of all agreements between Ow, Freeman and/or Oropeza; b) an accounting of the funds spent by Freeman on the El Cerrito Property; and c) declaratory relief that Ow is the fee simple owner of the El Cerrito Property, subject only to the liens of Citimortgage and Kevin Starr.[7] By trial, Ow had substantially refined his argument, contending that the May 30th contract was unconscionable under California law and therefore void.

Freeman asserted several counter-claims against Ow, including a) declaratory relief regarding the validity of the Note and Deed of Trust; b) breach of promissory note; c) breach of the May 30th contract; d) money had and received; e) intentional misrepresentation; and f) negligent misrepresentation. Freeman did not pursue his tort claims at trial, and instead focused on the validity of the Note and Deed of Trust by addressing Ow's unconscionability claim.

Ow first contends that the May 30th contract, the Note, and the Deed of Trust are unconscionable under California Civil Code § 1695.13. This section provides that "It is unlawful for any person to initiate, enter into, negotiate, or consummate any transaction involving residential real property in foreclosure, as defined in Section 1695.1, if such person, by the terms of such transaction, takes unconscionable advantage of the property owner in foreclosure." Civil Code §

---

[7] Citimortgage, Inc. is listed as the lienholder on the January 2015 Notice of Default. Ow did not disclose the origins of Starr's secured claim. Given the paucity of evidence regarding these claims, the court is only addressing the merits of Freeman's claim.

5

**Memorandum After Trial**

1695.1(b) defines certain critical terms in § 1695.13. Under § 1695.1(b), "'Residence in foreclosure" and "residential real property in foreclosure" means residential real property consisting of one to four-family dwelling units, one of which the owner occupies as his or her principal place of residence, against which there is an outstanding notice of default . . . ." While § 1695.13 is appealing to Ow, it is inapplicable. Section 1695.13 only applies to individuals who presently occupy a residence in foreclosure, not to a person who has previously occupied the residence. *See In re Phelps*, 93 Cal.App. 4th 451 (2001). Ow had not occupied the El Cerrito Property for several years.

Ow next contends that California's general unconscionability statute voids the Note and Deed of Trust (and any other obligation created by the May 30th contract). Civil Code § 1670.5 provides that "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." In making this determination, the court should consider the "commercial setting, purpose, and effect of the contract." Civil Code § 1670.5(b).

The doctrine of unconscionability is well established in California. Unconscionability has procedural and substantial components. Procedural unconscionability focuses on "oppression" or "surprise" due to unequal bargaining power "resulting in no meaningful choice for the weaker party . . . . ." *Carboni v. Arrospide*, 2 Cal.4th 76, 82 (1991). Substantive unconscionability examines whether the contract has an "overly harsh allocation of risks or costs which is not justified by the circumstances under which the contract was made." *Id*. at 83. While both elements must exist, they need not be present to the same degree. Rather, courts use a sliding scale when weighing these elements. "In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Aremendariz v. Foundation Health Psychcare Services, Inc*., 24 Cal.4th 83, 114 (2000).

Ow has established both elements, and the May 30th contract (and the resulting Note and

6

**Memorandum After Trial**

Deed of Trust) are unconscionable and therefore not enforceable. First, the May 30th contract, the Note, and the Deed of Trust are overly harsh and not justified by their circumstances. The Note does not contain an interest rate. Yet, in exchange for $38,960.50, Freeman expected a return of $105,000 in a matter of months. If the Oropeza sale had closed by the end of 2014, Freeman's rate of return would have exceeded 250%. Moreover, Freeman's investment was not a high risk venture. Freeman entered into the transaction with substantial equity in the El Cerrito Property and a buyer at hand. It was, at that point, "easy money." While excessive interest rates are typically the subject of usury challenges, the unconscionability doctrine may also apply. The *Carboni* court expressly invoked the unconscionability doctrine to affirm a Superior Court judgment which refused to enforce a secured note's excessive interest rate. The court of appeals noted that "cases finding unconscionability on the basis of gross price disparity" were "analogous authority," and that "[i]n essence, the interest rate is the 'price' of the money lent; at some point the price becomes so extreme that it is unconscionable." *Carboni*, 2 Cal.App. 4th at 82. This court finds that the terms of the May 30th contract, the Note and the Deed of Trust were substantively unconscionable.

The evidence also supports a finding of procedural unconscionability. While this case does not involve surprise, it certainly demonstrates that Ow had little, if any, bargaining power, and this left him without any meaningful choice. When Ow approached Freeman, he was homeless, distraught over the pending trustee's sale, and desperate to save his childhood home. His attempt to modify the Cititmortgage loan was unsuccessful, and an earlier Chapter 13 bankruptcy failed because he could not make his plan payments. While Ow did not offer any evidence regarding whether he had sought more traditional funding, the court notes that Oropeza's financing was expressly conditioned upon the retention of a contractor to repair the fire damage. Ow did not have the funds to pay for the repairs, and could not make his Citimortgage payments (which, based on Freeman's account summary, were not substantial). Moreover, Ow simply wanted to borrow enough funds to get current. Ow's deal with Freeman, however, initially required him to transfer 35% of the El Cerrito Property, and ultimately provided Freeman with a secured claim worth far more than the amount financed. These terms are the product of a substantially uneven playing field. While Freeman testified that he patiently explained all of the terms to Ow, this does not lessen the

7

**Memorandum After Trial**

fact that Ow may not have had any other viable options.

These facts demonstrate significant substantive unconscionability, with enough procedural unconscionability to render the May 30 contract, the Deed of Trust, and the Note unenforceable.

The evidence establishes that Freeman borrowed/spent $38,960.50 on the El Cerrito Property for Ow's benefit. Freeman therefore has a general unsecured claim in this amount.

Ow shall prepare a judgment consistent with this memorandum decision.[8]

**\*\*\* END OF ORDER \*\*\***

---

[8] Ow also named Oropeza and Passentine as defendants. They did not respond to the complaint, and their defaults were entered. Ow did not pursue his claims against them at trial, and those claims are therefore dismissed.

**COURT SERVICE LIST**

Recipients are ECF participants